**United States District Court**
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
                                    )  Case No. CV 12-6504 SC
9                                    )
     THE FLOREY INSTITUTE OF         )  ORDER GRANTING IN PART AND
10   NEUROSCIENCE AND MENTAL HEALTH, )  DENYING IN PART MOTION TO
                                     )  DISMISS
11                 Plaintiff,        )
                                     )
12          v.                       )
                                     )
13   KLEINER PERKINS CAUFIELD &      )
     BYERS, DOMAIN ASSOCIATES LLC,   )
14   SEARS CAPITAL MANAGEMENT, CAXTON)
     ADVANTAGE VENTURE PARTNERS LP,  )
15   STANLEY E. ABEL, AND PETER M.   )
     BREINING,                       )
16                                   )
                   Defendants.       )
17   _____)

18

19

20   I.   **INTRODUCTION**

21        Now before the Court is the above-captioned Defendants' motion

22   to dismiss Plaintiff the Florey Institute of Neuroscience and

23   Mental Health's ("Plaintiff") complaint.  ECF Nos. 1 ("Compl."), 30

24   ("MTD").  The motion is fully briefed.  ECF Nos. 32 ("Opp'n"), 35

25   ("Reply"), 39-1 ("Surreply").  The Court finds the matter

26   appropriate for resolution without oral argument.  Civ. L.R. 7-

27   1(b).

28        The Court GRANTS Defendants' request for judicial notice

**United States District Court**
For the Northern District of California

1  ("RJN"), ECF No. 31, under Federal Rule of Evidence 201, and takes

2  under advisement Plaintiff's response to the RJN, ECF No. 34.  In

3  that document, Plaintiff makes clear that it does not object to the

4  Court's granting Defendants' request but reserves its right to

5  object to the documents later, under other Rules of Evidence.

6       As discussed below, the Court GRANTS in part and DENIES in

7  part Defendants' motion to dismiss.

8

9  **II.  BACKGROUND**

10      Plaintiff is an Australian brain research organization.

11 Compl. ¶¶ 1-3, 12.  Plaintiff conducts extensive research into

12 relaxin, a naturally occurring peptide whose many uses include

13 treating acute heart failure.  See id. ¶¶ 5, 9.  Though it

14 possesses intellectual property and know-how concerning relaxin's

15 pharmaceutical applications, Plaintiff itself does not

16 commercialize relaxin.  See id. at ¶¶ 9-11.  Instead, it partners

17 with outside firms that seek to do so.  These firms tend to pay

18 Plaintiff for the use of its know-how and other intellectual

19 property.

20      In 1982, Plaintiff partnered with Genentech, Inc. to share

21 know-how, materials, and funding.  Id. ¶¶ 24-25.  In a contract,

22 the "1982 Agreement," Genentech agreed to pay Plaintiff royalties

23 on the proceeds of the net sales price of any relaxin-related

24 products, and a third of any other payments Genentech received for

25 sublicensing related to Plaintiff's technology.  Id. ¶ 25.  Between

26 1982 and 1987, Plaintiff and Genentech worked closely to solve

27 difficult problems in recombinant DNA technology relating to

28 relaxin's commercial production.  Id. ¶¶ 24-26.  In 1987, Genentech

United States District Court
For the Northern District of California

1  and Plaintiff re-executed an amended agreement (the "1987
2  Agreement") that added a term granting Plaintiff payments in the
3  event of a successful clinical trial.  Id. ¶ 27.

4      In 1993, Genentech established a separate entity that became
5  Connectics Corporation ("CNCT"), which would continue work on the
6  relaxin project, and to which Genentech would provide an exclusive
7  sublicense of Plaintiff's technology.  Id. ¶ 28.  Plaintiff granted
8  Genentech permission to do so, resulting in a 1993 sublicensing
9  agreement from Genentech to CNCT (the "1993 Sublicense").  Id. ¶
10 29.  In 1994 that agreement was replaced by an amendment that
11 granted Genentech the right to receive royalties on any licensed
12 product sales by CNCT, and CNCT in turn agreed to pay Plaintiff
13 royalties and other payments that would be due from Genentech per
14 the 1982 Agreement.  Id. ¶ 30.

15     In 1995, CNCT told Plaintiff that it wanted to enter a new
16 research agreement.  Id. ¶ 31.  Genentech granted Plaintiff
17 authority to negotiate an amendment to the 1987 Agreement directly
18 with CNCT.  Id.  CNCT wanted to reduce the royalty rate under that
19 agreement, because it believed the high rate would deter corporate
20 partners, so it proposed reducing the royalty rate and adding terms
21 that would give Plaintiff a share of future up-front and milestone
22 payments paid by CNCT's future drug-development partners.  Id.
23 Such partners would be necessary for this project, since CNCT was
24 too small to develop and commercialize relaxin by itself.  Id. ¶
25 32.

26     CNCT and Plaintiff negotiated between 1995 and 1998.  Id. ¶¶
27 32-34.  Plaintiff alleges that during these negotiations, it was
28 concerned that CNCT might try to avoid future payment obligations

to structure future drug-development agreements in a way that would allow it to avoid having to pay Plaintiff.  Id. ¶ 34.  For example, Plaintiff states that it feared the possibility of CNCT structuring a partnership deal in a way that would allow a drug-development partner to pay CNCT for the use of Plaintiff's IP and know-how without falling under the term of the agreement that would require CNCT to give Plaintiff a portion of those payments.  Id.  CNCT's CEO apparently told Plaintiff that its concerns were unfounded and that it would never do such a thing, so Plaintiff agreed to enter a new research agreement with CNCT.  Id.; Defs.' RJN Ex. A ("1998 Agreement").

The new agreement reduced Plaintiff's royalties, granted CNCT a license to Plaintiff's IP and know-how, and required CNCT to pay Plaintiff 3 percent of the future net sales of a relaxin-based product, 1 percent of up-front payments from drug-development partners, and 15 percent of development milestone payments from its "Partner," defined as "a third party who has entered into an agreement with CNCT for the manufacture, use or sale of a Licensed Product," with "Licensed Product" referring to relaxin-based products.  Id. ¶ 36; 1998 Agreement ¶ 1.3.  Between 1998 and 2001, CNCT entered various sublicensing agreements with drug-development partners that were seeking to develop relaxin for the treatment of scleroderma, an autoimmune disease, and it paid Plaintiff the required up-front and milestone fees associated with those development programs.  Id. ¶¶ 37-39.  In 2001, CNCT ceased its development efforts after its clinical trials for scleroderma were deemed unsuccessful, and in 2002, its relaxin team established a new commercial entity, Corthera (then called BAS Medical, Inc.).

United States District Court
For the Northern District of California

1    In 2003, Defendants Kleiner Perkins and Breining, a Corthera

2   founder, approached Plaintiff to seek assignment of the relaxin-

3   related license from CNCT to Corthera.  Id. ¶ 41.  In 2003,

4   Corthera negotiated an amendment to the 1998 Agreement that

5   extended the agreement's terms, permitted assignment of CNCT's

6   rights and obligations under the 1998 Agreement to Corthera, and

7   further reduced Plaintiff's royalty rates to 2 percent of net

8   sales.  Id. ¶¶ 42-44; Defs.' RJN Ex. B ("2003 Agreement").  The 1

9   percent up-front payments and 15 percent milestone payments,

10  described in the 1998 Agreement, would remain the same.  Id.

11  Corthera's rationale for negotiating these changes was the same as

12  CNCT's: it was too small to commercialize relaxin itself, so it

13  needed to license Plaintiff's IP and know-how to a bigger partner,

14  which might balk at the royalty payments -- thus the change in

15  payment terms.  See id.

16    From 2003 through 2009, Plaintiff and Corthera collaborated on

17  relaxin research.  Id. ¶¶ 45-49.  In 2007, Defendants Kleiner

18  Perkins and other yet-unknown defendants -- funders and board

19  members of Corthera -- recruited Defendant Abel as CEO of Corthera,

20  and Corthera switched its relaxin focus to cardiovascular

21  treatment.  Id. ¶ 46.  In 2008, Defendant Abel told Plaintiff that

22  he thought Corthera could grow into a public company if it could

23  partner with a drug-development company to take a relaxin-based

24  cardiac treatment program through phase III clinical trials.  Id. ¶

25  47.  Corthera completed its phase II clinical trials in March 2009

26  and initiated phase III clinical trials in October 2009.  Id. ¶ 48.

27    The following facts go to the core of Plaintiff's complaint.

28  In December 2009, Plaintiff learned from a press release that the

pharmaceutical company Novartis had agreed to purchase Corthera up-front for $120 million in cash, characterized as a stock-purchase agreement that would leave Corthera as a wholly owned subsidiary of Novartis.  Id. ¶ 49; Defs.' RJN Ex. D ("Press Release"); see also Defs.' RJN Exs. C ("Merger Agreement"), E ("Merger Certificate"). Corthera had apparently not given Plaintiff notice of the sale or provided it with documentation related to the sale or any putative assignments of rights in Plaintiff's IP.  Id.

According to the press release through which Plaintiff learned of the sale, Novartis would pay Corthera's shareholders up to $500 million in milestone payments related to relaxin commercialization, as well as up-front payments.  Id. ¶¶ 49, 52-53.  The Merger Agreement confirms this.  It sets out six milestone payments to be made from Novartis to Corthera's shareholders, contingent on Corthera and Novartis's using diligent efforts to achieve the milestone events.  Merger Agreement ¶¶ 9.1-9.3.  The merger made Corthera a wholly owned subsidiary of Novartis and converted all existing Corthera stock to cash and contingent rights to receive additional cash based on those milestone payments.  Compl. ¶ 49; Defs.' RJN Ex. E.

The key language from the original 1998 Agreement, as amended by the 2003 Agreement, is as follows:

> 5.2. Revenue Received from Partners
> (a) CNCT shall pay [Plaintiff] one percent (1%) of Up-front Payments [defined as payments "from a Partner in the nature of a one-time license fee, option fee or like payment on account of the grant by CNCT . . . of a license . . . to manufacture, use or sell Relaxin . . . ."]
> (b) CNCT shall pay [Plaintiff] fifteen percent (15%) of the Net Revenues, if

1
2
3

> any: (i) from payments received by CNCT from a Partner for the achievement of key development milestones (e.g., initiation of Phase III studies, BLA filing and approval) for Licensed Products . . . .

4  1998 Agreement ¶¶ 1.5, 5.2; 2003 Agreement ¶ 5.2(b).

5      The 2009 press release also apparently stated that Novartis
6  bought Corthera so it could acquire rights to Plaintiff's relaxin
7  IP, so that Novartis could develop and commercialize relaxin. Id.
8  ¶ 49.  At the time of the acquisition, Defendants Kleiner Perkins,
9  Domain Associates, Sears Capital, and Breining were on Corthera's
10  board, and Defendant Abel was Corthera's CEO. Id. ¶ 51.

11      Plaintiff states that it does not know at this stage whether
12  Novartis has made any payments under the Merger Agreement. Id. ¶
13  55.  However, it alleges that in September 2011, Novartis and
14  Corthera indicated that they would not pay Plaintiff any portion of
15  the payments Novartis might make under its agreement with Corthera,
16  and on September 26, 2012, Novartis announced successful results
17  from phase III clinical studies of relaxin's application to
18  patients with acute heart failure. Id. ¶¶ 54-56.  This apparently
19  suggests to Plaintiff that Novartis used Plaintiff's IP and know-
20  how without a license.

21      The crux of Plaintiff's complaint is that the fears it
22  expressed during its 1995-98 negotiations with CNCT have been
23  realized: CNCT, now Corthera, structured an agreement with a drug-
24  development partner in a way that allowed the partner to use
25  Plaintiff's IP and know-how without having to make any payments to
26  Plaintiff.  Based on the facts described above, Plaintiff asserts
27  four causes of action against Defendants: (1) conversion, (2)
28  misappropriation, (3) unjust enrichment, and (4) constructive trust

under California Civil Code sections 2223 and 2224.  Defendants now move to dismiss.

## III.   **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

///

///

///

## IV.   **DISCUSSION**

**United States District Court**
For the Northern District of California

1      A.   **Alter Ego**

2          Defendants' motion to dismiss raises an alter ego theory:

3      Plaintiff's complaint fails because it is trying to hold a

4      corporation's former stockholders liable for the corporation's

5      alleged acts.  <u>See</u> MTD at 8-14.

6          "Ordinarily, a corporation is regarded as a legal entity

7      separate and distinct from its stockholders, officers and

8      directors.  Under the alter ego doctrine, however, where a

9      corporation is used by an individual or individuals, or by another

10     corporation, to perpetrate fraud, circumvent a statute, or

11     accomplish some other wrongful or inequitable purpose, a court may

12     disregard the corporate entity and treat the corporation's acts as

13     if they were done by the persons actually controlling the

14     corporation."  <u>Robbins v. Blecher</u>, 52 Cal. App. 4th 886, 892 (Cal.

15     Ct. App. 1997).  "Shareholders of a corporation are not normally

16     liable for its torts, but personal liability may attach to them

17     through application of the 'alter ego' doctrine . . . , or when the

18     shareholder specifically directed or authorized the wrongful acts."

19     <u>Wyatt v. Union Mortgage Co.</u>, 24 Cal. 3d 773, 785 (Cal. 1979).

20         Defendants contend that Plaintiff fails to pierce the

21     corporate veil using the alter ego theory.  MTD at 9-11.  The

22     problem with this argument is that Plaintiff has alleged that

23     Defendants specifically directed or authorized the torts in

24     question here.  <u>See</u> Opp'n at 21-23; <u>see also</u> <u>PMC, Inc. v. Kadisha</u>,

25     78 Cal. App. 4th 1368, 1382 (Cal. Ct. App. 2000) (shareholders and

26     directors can be held liable alongside corporations if they are

27     shown to have participated in an intentional tort).  Defendants'

28     insistence that Plaintiff fails to plead an alter ego theory is

1   therefore irrelevant.  It is not the theory on which Plaintiff
2   relies in naming Defendants in its complaint.  Defendants contend
3   that Plaintiff's pleadings are conclusory on this point, Reply at
4   8-9, but the Court finds that Plaintiff has pled enough to survive
5   a motion to dismiss on these grounds, since their claims as to
6   Defendants' actions are particular and plausible enough to meet the
7   standards of Rule 8, <u>Twombly</u>, and <u>Iqbal</u>.  <u>See</u> Compl. ¶¶ 41-42, 47,
8   51-53 (describing specific Defendants' actions in relation to
9   Novartis's acquisition of Corthera and their knowledge of
10  Plaintiff's property and contracts).

11       Defendants counter that even this theory must fail because
12  Plaintiff is seeking to hold Defendants liable for Corthera's
13  contractual obligations.  This argument is inappropriate at this
14  stage.  Contracts may underlie Plaintiff's claims, but Plaintiff is
15  not exactly saying that Corthera should have paid Plaintiff --
16  Plaintiff is saying that Defendants' actions were constructed
17  specifically to preempt those contractual payments and to divert
18  future payments to Defendants.

19       Accordingly, at this point, the Court cannot find as a matter
20  of law that Plaintiff's claim should be dismissed for failure to
21  plead alter ego.

22       **B.**   **<u>Assignment</u>**

23       The parties also dispute whether Novartis's merger with
24  Corthera transferred Corthera's licenses of Plaintiff's IP and
25  know-how to Novartis.  According to Defendants, if Corthera remains
26  licensee of Plaintiff's IP and know-how, no property or interest in
27  property could have been converted or misappropriated.  Reply at 5-
28  7.  Plaintiff contends that as a result of Novartis's merger with

United States District Court
For the Northern District of California

Corthera, Novartis assumed Corthera's license agreement with
Plaintiff, because the merger alone effected a legal transfer or
Corthera's rights to Novartis without Plaintiff's permission.
Surreply at 3 (citing <u>SQL Solutions, Inc. v. Oracle Corp.</u>, No. C-
91-1079 MHP, 1991 WL 626458 (N.D. Cal. Dec. 18, 1991)).

Novartis's merger with Corthera was structured as a "reverse
triangular merger," in which the acquisition target survives the
merger intact, as a wholly-owned subsidiary of the acquiring
corporation, instead of being merged into a corporation or a
separate subsidiary as in a standard "forward merger." <u>See</u> 2
Ballentine & Sterling, <u>California Corporation Laws</u> 12-15 (4th ed.
2003).

In a reverse triangular merger, the target corporation
continues to own its assets even though the acquiring corporation
owns all of the target's stock. As Plaintiff notes, however, the
Court has found in the past that reverse triangular mergers result
in the transference of the acquired company's rights, by law, to
the acquiring company. <u>SQL Solutions</u>, 1991 WL 626458, at *3-4.
The reasoning in <u>SQL</u> was based in part on <u>Trubowitch v. Riverbank
Canning Co.</u>, 30 Cal. 2d 335, 344-45 (Cal. 1947), which held that
"if an assignment results merely from a change in the legal form of
ownership of a business, its validity depends upon whether it
affects the interests of the parties protected by the
nonassignability of the contract." No other cases have analyzed
this issue.

Defendants are correct that there was no assignment, but not
for the reasons they gave. <u>See</u> Reply at 5-6 (citing, among other
things, inapposite Delaware cases). Under California law,

**United States District Court**
For the Northern District of California

Trubowitch is the controlling precedent on this matter, and its
rule is conditional: "if an assignment results merely from a change
in the legal form of ownership of a business, its validity depends
upon whether it affects the interests of the parties protected by
the nonassignability of the contract."  30 Cal. 2d at 344-45.  This
means that for a court to assess the validity of a purported
assignment, there must first have been an assignment by virtue of a
business's change in legal form of ownership.  While such an
assignment would probably affect Plaintiff's interests under the
nonassignment clause, it is entirely unclear as to whether a
reverse triangular merger actually effects an assignment of a
target corporation's assets.

No California state court has resolved this matter, and the
Court is not inclined to guess at possible conclusions.  The Court
therefore begins from the presumption that a reverse triangular
merger, which leaves intact the acquired corporation, does not
effect a transfer of rights from the wholly owned subsidiary to its
acquirer as a matter of law.  What little applicable law there is
could be analogized from California cases on stock sales, like
Farmland Irrigation Co. v. Dopplmaier, 48 Cal. 2d 208, 223 (Cal.
1957), which suggested that if a plaintiff had sold all of his
stock in a corporation, there could be no contention that the
corporation's licenses would be extinguished as a matter of law,
since the two contracting parties were still extant and in privity.

Plaintiff relies solely on SQL Solutions to argue that
assignment occurred as a matter of law when an acquired corporation
became another corporation's wholly owned subsidiary.  That case
did not analyze nonassignment clauses and also found that federal

copyright law forbid transfer.  1991 WL 626458, at *5.  In any

event, on this point the Court is bound by the California Supreme

Court's longstanding decision from <u>Trubowitch</u>.  Accordingly, the

Court finds that Corthera, Novartis's wholly owned subsidiary,

remains licensee of Plaintiff's IP and know-how.

**C.   <u>Conversion</u>**

The elements of a claim for conversion are (1) ownership or

right to possession of property, (2) wrongful disposition of the

property right, and (3) damages.  <u>Kremen v. Cohen</u>, 337 F.3d 1024,

1029 (9th Cir. 2003).  A plaintiff need not have legal ownership or

absolute ownership of the property.  <u>Messerall v. Fulwider</u>, 199

Cal. App. 3d 1324, 1329 (Cal. Ct. App. 1988).  It need only allege

that it is entitled to immediate possession of the property at the

time of conversion.  <u>Bastanchury v. Times-Mirror Co.</u>, 68 Cal. App.

2d 217, 236 (Cal. Ct. App. 1954).  However, a mere contractual

right of payment, without more, will not suffice to state a claim

for conversion.  <u>Farmers Ins. Exch. v. Zerin</u>, 53 Cal. App. 4th 445,

452 (Cal. Ct. App. 1997).

If, however, "there is a specific, identifiable sum involved,

such as where an agent accepts a sum of money to be paid to another

and fails to make the payment," a cause of action for conversion

exists.  <u>Burlesci v. Petersen</u>, 68 Cal. App. 4th 1062, 1066 (Cal Ct.

App. 1998).  If money is not specifically identified, then the

proper action is in contract or for debt.  <u>Baxter v. King</u>, 81 Cal.

App. 192, 194 (Cal. Ct. App. 1927).

Plaintiff's conversion claim critically fails to distinguish

what Defendants converted: intellectual property, know-how, payment

rights, or something else.  So far as Plaintiff pleads that

United States District Court
For the Northern District of California

1  Defendants converted Plaintiff's intellectual property rights,

2  Plaintiff's conversion claim fails because Plaintiff has not

3  plausibly alleged that Defendants themselves wrongly disposed of

4  the rights in question.  Plaintiff's pleadings and arguments

5  suggest that Novartis obtained access to the intellectual property

6  rights that Corthera licensed from Plaintiff, but nothing in

7  Plaintiff's complaint states that Defendants themselves -- as

8  opposed to Corthera or Novartis -- managed to dispose of

9  Plaintiff's intellectual property.  In any event, no assignment

10 took place, so if any wrongful disposition of a property right

11 occurred, its remedy would appear to lie against Corthera or

12 Novartis in contract or under state and federal intellectual

13 property laws, because, Plaintiff has failed to allege how

14 Defendants actually caused Plaintiff's IP or know-how to be

15 converted.

16     If Plaintiff is arguing that Defendants wrongfully disposed of

17 Plaintiff's right to be paid under a contract, no conversion claim

18 can lie for that.  According to the 1998 and 2003 Agreements,

19 Plaintiff was to be paid if Corthera entered a partnership deal,

20 but Corthera's merger and acquisition was not such a transaction.

21 Plaintiff has therefore not pled that it was entitled to the

22 payments it claims Novartis made to Corthera.  They fall outside

23 the contracts that govern those parties' relationships, and

24 Plaintiff has not adequately alleged that any payment was

25 specifically being sent to Plaintiff.

26     In any event, the money at the center of Plaintiff's claim is

27 not quite the "contractual right of payment" that California law

28 generally forbids as the predicate for a conversion claim, but it

is also not a plausible enough basis to support this cause of

action.  Plaintiff's allegations on this point are simply too vague

and attenuated.  Moreover, Plaintiff has not pled enough to show

that an equitable lien was created at any point, since it is not

clear from Plaintiff's pleadings that Defendants themselves

promised Plaintiff anything.  See Cnty. of L.A. v. Constr. Laborers

Trust Funds for S. Cal. Admin. Co., 137 Cal. App. 4th 410, 414

(Cal. Ct. App. 2006) (equitable lien created by oral agreement

where defendants were aware of reliance by plaintiff of promise of

payment in exchange for work).

　　　Plaintiff's conversion claim is DISMISSED with leave to amend,

to allow Plaintiff to plead a more precise and plausible claim.

**D.   Misappropriation**

　　　Plaintiff's misappropriation claim fails for the same reason

as its conversion claim.[1]  Plaintiff's allegations simply do not

support the charge that Defendants actually appropriated and used

Plaintiff's property.  The claim is so attenuated that it fails to

be plausible, and it fails to make clear exactly what Defendants --

as opposed to some other party -- took or misused, whether IP,

know-how, payment, or something else.

　　　If anyone actually appropriated or used Plaintiff's

intellectual property and know-how, Plaintiff's pleadings seem to

point more to Corthera or Novartis.  If Defendants are being paid

for Corthera's up-front payments and milestones, then apparently

[1] The Court declines to entertain the parties' arguments about preemption at this point.  It is not clear that any preemption argument would be relevant to the tort claims Plaintiff makes, which do not rely solely on intellectual property claims.  In any event, Defendants raise the issue only in a footnote, a tactic both parties decry at different turns.

United States District Court
For the Northern District of California

1  Corthera is partnering with someone and is therefore breaching the

2  terms of its contracts with Plaintiff, or Novartis is infringing

3  some property right.  Plaintiff has not made clear why Defendants

4  should be held liable for that by virtue of a merger, even if

5  Plaintiff does allege that Defendants structured the sale to

6  benefit themselves at Plaintiff's expense.  This claim is DISMISSED

7  with leave to amend for the same reasons as Plaintiff's conversion

8  claim.

9      **E.   <u>Unjust Enrichment</u>**

10         Plaintiff also brings a claim for unjust enrichment or quasi-

11  contract, the elements of which are (1) a defendant's receipt of a

12  benefit and (2) unjust retention of that benefit at the plaintiff's

13  expense.  <u>Peterson v. Cellco P'ship</u>, 164 Cal. App. 4th 1583, 1593

14  (Cal. Ct. App. 2008).  Unjust enrichment is an equitable claim that

15  sounds in implied or quasi-contract.  See <u>Paracor Fin., Inc. v.</u>

16  <u>Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1167 (9th Cir. 1996).  "The

17  doctrine applies where plaintiffs, having no enforceable contract,

18  nonetheless have conferred a benefit on defendant which defendant

19  has knowingly accepted under circumstances that make it inequitable

20  for the defendant to retain the benefit without paying for its

21  value."  <u>Hernandez v. Lopez</u>, 180 Cal. App. 4th 932, 938 (Cal. Ct.

22  App. 2009).

23         Plaintiff alleges that Defendants knew of Plaintiff's

24  contracts with Corthera but wanted to use Corthera's future work

25  with Novartis to enrich themselves instead of Plaintiff.  Plaintiff

26  claims that in order to accomplish this, Defendants set up a merger

27  between Novartis and Corthera that predicted Novartis having some

28  form of access to Plaintiff's relaxin IP and know-how, but since

16

1  the transaction was not technically a "Partnership" per the 1998

2  and 2003 Agreements, Defendants -- not Plaintiff -- would receive

3  up-front and milestone payments that could be classified instead as

4  payments from the Merger Agreement.

5        First, Defendants argue that Plaintiff fails to describe a

6  "benefit" to which it is entitled, because Corthera, not

7  Defendants, was the party responsible for making contractual

8  payments to Plaintiff . MTD at 18. This is not an accurate

9  statement of Plaintiff's claim. Plaintiff's complaint fully

10 accounts for the fact that Corthera was responsible for making

11 payments to Plaintiff in the event of a partnership. See Compl. ¶¶

12 49, 51-53, 57. The point of Plaintiff's unjust enrichment claim,

13 however, is that Defendants set up an arrangement that would

14 essentially work as a partnership between Corthera and Novartis,

15 but that would be structured in a way that diverted Corthera's

16 payments from Plaintiff to Defendants.

17       Second, Defendants claim that Plaintiff alleges no facts that

18 would permit the Court to treat Novartis's payments to Defendants

19 as benefits allegedly owed to Plaintiff under the 1998 and 2003

20 Agreements. MTD at 19. This is essentially a restatement of

21 Defendants' first argument on this point, and it fails for the same

22 reasons.

23       Third, Defendants argue that Plaintiff's unjust enrichment

24 claim fails because it is governed by the express terms of a

25 contract. MTD at 19-20. It is true that no unjust enrichment

26 claim exists if express agreements define the parties' rights.

27 Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94

28 Cal. App. 4th 151, 172 (Cal. Ct. App. 2001). But no contract

governing payments from Novartis to Defendants exists between Defendants and Plaintiff, who are the only parties to this action. That is the point of Plaintiff's unjust enrichment claim, and it is also the point of the unjust enrichment doctrine. See Hernandez, 180 Cal. App. 4th at 938.

Finally, Defendants contend that the Court has previously disallowed claims for unjust enrichment pled on their own and not as an alternative avenue of relief. Reply at 14 (citing Colucci v. ZonePerfect Nutrition Co., No. 12-2907 SC, 2012 WL 6737800, at *10 (N.D. Cal. Dec. 28, 2012)). That is true, but Plaintiff need not use the magic word "alternatively" to indicate that its claim was made in the alternative. See Fed. R. Civ. P. 8; Coleman v. Standard Life Ins. Co., 288 F. Supp. 2d 1116, 1120 (E.D. Cal. 2003) ("Under Rule 8, plaintiff need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [he was] doing.") (internal citations and quotations omitted). The Court finds that Plaintiff's claim for unjust enrichment was made in the alternative to its conversion and misappropriation claims, and declines to dismiss this cause of action on a technicality.

Defendants' motion to dismiss Plaintiff's unjust enrichment claim is therefore DENIED.

**F.   Constructive Trust**

Plaintiff asserts a cause of action for constructive trust against Defendants. "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." Burlesci v. Peterson, 68 Cal. App. 4th 1062,

1069 (Cal. Ct. App. 1998).  It is an equitable remedy to prevent
unjust enrichment.  See id.; see also Malfatti v. Mortg. Elec.
Registrations Sys., Inc., No. C 11-03142 WHA, 2011 WL 5975055, at
*3 (N.D. Cal. Nov. 29, 2011) (constructive trust is a remedy, not a
claim for relief).  Defendants move to dismiss the claim on the
grounds that a constructive trust is a remedy, not a claim.  MTD at
20-21.

The Court agrees with Defendants.  Plaintiff's constructive
trust claim must be dismissed because a constructive trust is only
a remedy.  Defendants' motion to dismiss Plaintiff's claim for
constructive trust is GRANTED with prejudice, but Plaintiff has
leave to clarify its request for constructive trust as a remedy.

**V.**   **CONCLUSION**

For the reasons described above, the Court GRANTS in part and
DENIES in part the above-captioned Defendants' motion to dismiss
Plaintiff Florey Institute of Neuroscience and Mental Health's
complaint.  Plaintiff's unjust enrichment claim is undisturbed.
All other claims are DISMISSED.  Plaintiff has thirty (30) days
from this Order's signature date to file an amended complaint, if
it chooses to do so.  Failure to file an amended complaint may
result in the deficient claims being dismissed with prejudice.

IT IS SO ORDERED.

Dated: September 26, 2013

_____
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

19