IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE FLOREY INSTITUTE OF NEUROSCIENCE AND MENTAL HEALTH,<br><br>    Plaintiff,<br><br>    v.<br><br>KLEINER PERKINS CAUFIELD & BYERS, DOMAIN ASSOCIATES LLC, SEARS CAPITAL MANAGEMENT, CAXTON ADVANTAGE VENTURE PARTNERS LP, STANLEY E. ABEL, AND PETER M. BREINING,<br><br>    Defendants. | Case No. CV 12-6504 SC<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO <u>DISMISS</u> |

## I.  **INTRODUCTION**

Now before the Court is the above-captioned Defendants' motion to dismiss Plaintiff the Florey Institute of Neuroscience and Mental Health's ("Plaintiff") complaint.  ECF Nos. 1 ("Compl."), 30 ("MTD").  The motion is fully briefed.  ECF Nos. 32 ("Opp'n"), 35 ("Reply"), 39-1 ("Surreply").  The Court finds the matter appropriate for resolution without oral argument.  Civ. L.R. 7-1(b).

The Court GRANTS Defendants' request for judicial notice

("RJN"), ECF No. 31, under Federal Rule of Evidence 201, and takes under advisement Plaintiff's response to the RJN, ECF No. 34. In that document, Plaintiff makes clear that it does not object to the Court's granting Defendants' request but reserves its right to object to the documents later, under other Rules of Evidence.

As discussed below, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.

**II.    BACKGROUND**

Plaintiff is an Australian brain research organization. Compl. ¶¶ 1-3, 12. Plaintiff conducts extensive research into relaxin, a naturally occurring peptide whose many uses include treating acute heart failure. See id. ¶¶ 5, 9. Though it possesses intellectual property and know-how concerning relaxin's pharmaceutical applications, Plaintiff itself does not commercialize relaxin. See id. at ¶¶ 9-11. Instead, it partners with outside firms that seek to do so. These firms tend to pay Plaintiff for the use of its know-how and other intellectual property.

In 1982, Plaintiff partnered with Genentech, Inc. to share know-how, materials, and funding. Id. ¶¶ 24-25. In a contract, the "1982 Agreement," Genentech agreed to pay Plaintiff royalties on the proceeds of the net sales price of any relaxin-related products, and a third of any other payments Genentech received for sublicensing related to Plaintiff's technology. Id. ¶ 25. Between 1982 and 1987, Plaintiff and Genentech worked closely to solve difficult problems in recombinant DNA technology relating to relaxin's commercial production. Id. ¶¶ 24-26. In 1987, Genentech

and Plaintiff re-executed an amended agreement (the "1987 Agreement") that added a term granting Plaintiff payments in the event of a successful clinical trial. Id. ¶ 27.

In 1993, Genentech established a separate entity that became Connectics Corporation ("CNCT"), which would continue work on the relaxin project, and to which Genentech would provide an exclusive sublicense of Plaintiff's technology. Id. ¶ 28. Plaintiff granted Genentech permission to do so, resulting in a 1993 sublicensing agreement from Genentech to CNCT (the "1993 Sublicense"). Id. ¶ 29. In 1994 that agreement was replaced by an amendment that granted Genentech the right to receive royalties on any licensed product sales by CNCT, and CNCT in turn agreed to pay Plaintiff royalties and other payments that would be due from Genentech per the 1982 Agreement. Id. ¶ 30.

In 1995, CNCT told Plaintiff that it wanted to enter a new research agreement. Id. ¶ 31. Genentech granted Plaintiff authority to negotiate an amendment to the 1987 Agreement directly with CNCT. Id. CNCT wanted to reduce the royalty rate under that agreement, because it believed the high rate would deter corporate partners, so it proposed reducing the royalty rate and adding terms that would give Plaintiff a share of future up-front and milestone payments paid by CNCT's future drug-development partners. Id. Such partners would be necessary for this project, since CNCT was too small to develop and commercialize relaxin by itself. Id. ¶ 32.

CNCT and Plaintiff negotiated between 1995 and 1998. Id. ¶¶ 32-34. Plaintiff alleges that during these negotiations, it was concerned that CNCT might try to avoid future payment obligations

3

to structure future drug-development agreements in a way that would allow it to avoid having to pay Plaintiff. Id. ¶ 34. For example, Plaintiff states that it feared the possibility of CNCT structuring a partnership deal in a way that would allow a drug-development partner to pay CNCT for the use of Plaintiff's IP and know-how without falling under the term of the agreement that would require CNCT to give Plaintiff a portion of those payments. Id. CNCT's CEO apparently told Plaintiff that its concerns were unfounded and that it would never do such a thing, so Plaintiff agreed to enter a new research agreement with CNCT. Id.; Defs.' RJN Ex. A ("1998 Agreement").

The new agreement reduced Plaintiff's royalties, granted CNCT a license to Plaintiff's IP and know-how, and required CNCT to pay Plaintiff 3 percent of the future net sales of a relaxin-based product, 1 percent of up-front payments from drug-development partners, and 15 percent of development milestone payments from its "Partner," defined as "a third party who has entered into an agreement with CNCT for the manufacture, use or sale of a Licensed Product," with "Licensed Product" referring to relaxin-based products. Id. ¶ 36; 1998 Agreement ¶ 1.3. Between 1998 and 2001, CNCT entered various sublicensing agreements with drug-development partners that were seeking to develop relaxin for the treatment of scleroderma, an autoimmune disease, and it paid Plaintiff the required up-front and milestone fees associated with those development programs. Id. ¶¶ 37-39. In 2001, CNCT ceased its development efforts after its clinical trials for scleroderma were deemed unsuccessful, and in 2002, its relaxin team established a new commercial entity, Corthera (then called BAS Medical, Inc.).

1    In 2003, Defendants Kleiner Perkins and Breining, a Corthera
2 founder, approached Plaintiff to seek assignment of the relaxin-
3 related license from CNCT to Corthera.  Id. ¶ 41.  In 2003,
4 Corthera negotiated an amendment to the 1998 Agreement that
5 extended the agreement's terms, permitted assignment of CNCT's
6 rights and obligations under the 1998 Agreement to Corthera, and
7 further reduced Plaintiff's royalty rates to 2 percent of net
8 sales.  Id. ¶¶ 42-44; Defs.' RJN Ex. B ("2003 Agreement").  The 1
9 percent up-front payments and 15 percent milestone payments,
10 described in the 1998 Agreement, would remain the same.  Id.
11 Corthera's rationale for negotiating these changes was the same as
12 CNCT's: it was too small to commercialize relaxin itself, so it
13 needed to license Plaintiff's IP and know-how to a bigger partner,
14 which might balk at the royalty payments -- thus the change in
15 payment terms.  See id.
16    From 2003 through 2009, Plaintiff and Corthera collaborated on
17 relaxin research.  Id. ¶¶ 45-49.  In 2007, Defendants Kleiner
18 Perkins and other yet-unknown defendants -- funders and board
19 members of Corthera -- recruited Defendant Abel as CEO of Corthera,
20 and Corthera switched its relaxin focus to cardiovascular
21 treatment.  Id. ¶ 46.  In 2008, Defendant Abel told Plaintiff that
22 he thought Corthera could grow into a public company if it could
23 partner with a drug-development company to take a relaxin-based
24 cardiac treatment program through phase III clinical trials.  Id. ¶
25 47.  Corthera completed its phase II clinical trials in March 2009
26 and initiated phase III clinical trials in October 2009.  Id. ¶ 48.
27    The following facts go to the core of Plaintiff's complaint.
28 In December 2009, Plaintiff learned from a press release that the

5

pharmaceutical company Novartis had agreed to purchase Corthera up-front for $120 million in cash, characterized as a stock-purchase agreement that would leave Corthera as a wholly owned subsidiary of Novartis. Id. ¶ 49; Defs.' RJN Ex. D ("Press Release"); see also Defs.' RJN Exs. C ("Merger Agreement"), E ("Merger Certificate"). Corthera had apparently not given Plaintiff notice of the sale or provided it with documentation related to the sale or any putative assignments of rights in Plaintiff's IP. Id.

According to the press release through which Plaintiff learned of the sale, Novartis would pay Corthera's shareholders up to $500 million in milestone payments related to relaxin commercialization, as well as up-front payments. Id. ¶¶ 49, 52-53. The Merger Agreement confirms this. It sets out six milestone payments to be made from Novartis to Corthera's shareholders, contingent on Corthera and Novartis's using diligent efforts to achieve the milestone events. Merger Agreement ¶¶ 9.1-9.3. The merger made Corthera a wholly owned subsidiary of Novartis and converted all existing Corthera stock to cash and contingent rights to receive additional cash based on those milestone payments. Compl. ¶ 49; Defs.' RJN Ex. E.

The key language from the original 1998 Agreement, as amended by the 2003 Agreement, is as follows:

> 5.2. <u>Revenue Received from Partners</u>
> (a) CNCT shall pay [Plaintiff] one percent (1%) of Up-front Payments [defined as payments "from a Partner in the nature of a one-time license fee, option fee or like payment on account of the grant by CNCT . . . of a license . . . to manufacture, use or sell Relaxin . . . ."]
> (b) CNCT shall pay [Plaintiff] fifteen percent (15%) of the Net Revenues, if

6

|   |   |
|---|---|
| 1 | any: (i) from payments received by CNCT from a Partner for the achievement of key development milestones (e.g., initiation of Phase III studies, BLA filing and approval) for Licensed Products . . . . |
| 2 |   |
| 3 |   |

1998 Agreement ¶¶ 1.5, 5.2; 2003 Agreement ¶ 5.2(b).

The 2009 press release also apparently stated that Novartis bought Corthera so it could acquire rights to Plaintiff's relaxin IP, so that Novartis could develop and commercialize relaxin. Id. ¶ 49. At the time of the acquisition, Defendants Kleiner Perkins, Domain Associates, Sears Capital, and Breining were on Corthera's board, and Defendant Abel was Corthera's CEO. Id. ¶ 51.

Plaintiff states that it does not know at this stage whether Novartis has made any payments under the Merger Agreement. Id. ¶ 55. However, it alleges that in September 2011, Novartis and Corthera indicated that they would not pay Plaintiff any portion of the payments Novartis might make under its agreement with Corthera, and on September 26, 2012, Novartis announced successful results from phase III clinical studies of relaxin's application to patients with acute heart failure. Id. ¶¶ 54-56. This apparently suggests to Plaintiff that Novartis used Plaintiff's IP and know-how without a license.

The crux of Plaintiff's complaint is that the fears it expressed during its 1995-98 negotiations with CNCT have been realized: CNCT, now Corthera, structured an agreement with a drug-development partner in a way that allowed the partner to use Plaintiff's IP and know-how without having to make any payments to Plaintiff. Based on the facts described above, Plaintiff asserts four causes of action against Defendants: (1) conversion, (2) misappropriation, (3) unjust enrichment, and (4) constructive trust

7

1  under California Civil Code sections 2223 and 2224.  Defendants now
2  move to dismiss.

### III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

///
///
///

### IV. DISCUSSION

### A. Alter Ego

Defendants' motion to dismiss raises an alter ego theory: Plaintiff's complaint fails because it is trying to hold a corporation's former stockholders liable for the corporation's alleged acts. See MTD at 8-14.

"Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." Robbins v. Blecher, 52 Cal. App. 4th 886, 892 (Cal. Ct. App. 1997). "Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them through application of the 'alter ego' doctrine . . . , or when the shareholder specifically directed or authorized the wrongful acts." Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 785 (Cal. 1979).

Defendants contend that Plaintiff fails to pierce the corporate veil using the alter ego theory. MTD at 9-11. The problem with this argument is that Plaintiff has alleged that Defendants specifically directed or authorized the torts in question here. See Opp'n at 21-23; see also PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1382 (Cal. Ct. App. 2000) (shareholders and directors can be held liable alongside corporations if they are shown to have participated in an intentional tort). Defendants' insistence that Plaintiff fails to plead an alter ego theory is

9

therefore irrelevant.  It is not the theory on which Plaintiff relies in naming Defendants in its complaint.  Defendants contend that Plaintiff's pleadings are conclusory on this point, Reply at 8-9, but the Court finds that Plaintiff has pled enough to survive a motion to dismiss on these grounds, since their claims as to Defendants' actions are particular and plausible enough to meet the standards of Rule 8, Twombly, and Iqbal.  See Compl. ¶¶ 41-42, 47, 51-53 (describing specific Defendants' actions in relation to Novartis's acquisition of Corthera and their knowledge of Plaintiff's property and contracts).

   Defendants counter that even this theory must fail because Plaintiff is seeking to hold Defendants liable for Corthera's contractual obligations.  This argument is inappropriate at this stage.  Contracts may underlie Plaintiff's claims, but Plaintiff is not exactly saying that Corthera should have paid Plaintiff -- Plaintiff is saying that Defendants' actions were constructed specifically to preempt those contractual payments and to divert future payments to Defendants.

   Accordingly, at this point, the Court cannot find as a matter of law that Plaintiff's claim should be dismissed for failure to plead alter ego.

   **B.   Assignment**

   The parties also dispute whether Novartis's merger with Corthera transferred Corthera's licenses of Plaintiff's IP and know-how to Novartis.  According to Defendants, if Corthera remains licensee of Plaintiff's IP and know-how, no property or interest in property could have been converted or misappropriated.  Reply at 5-7.  Plaintiff contends that as a result of Novartis's merger with

10

Corthera, Novartis assumed Corthera's license agreement with Plaintiff, because the merger alone effected a legal transfer or Corthera's rights to Novartis without Plaintiff's permission. Surreply at 3 (citing SQL Solutions, Inc. v. Oracle Corp., No. C-91-1079 MHP, 1991 WL 626458 (N.D. Cal. Dec. 18, 1991)).

Novartis's merger with Corthera was structured as a "reverse triangular merger," in which the acquisition target survives the merger intact, as a wholly-owned subsidiary of the acquiring corporation, instead of being merged into a corporation or a separate subsidiary as in a standard "forward merger." See 2 Ballentine & Sterling, California Corporation Laws 12-15 (4th ed. 2003).

In a reverse triangular merger, the target corporation continues to own its assets even though the acquiring corporation owns all of the target's stock. As Plaintiff notes, however, the Court has found in the past that reverse triangular mergers result in the transference of the acquired company's rights, by law, to the acquiring company. SQL Solutions, 1991 WL 626458, at *3-4. The reasoning in SQL was based in part on Trubowitch v. Riverbank Canning Co., 30 Cal. 2d 335, 344-45 (Cal. 1947), which held that "if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." No other cases have analyzed this issue.

Defendants are correct that there was no assignment, but not for the reasons they gave. See Reply at 5-6 (citing, among other things, inapposite Delaware cases). Under California law,

11

Trubowitch is the controlling precedent on this matter, and its rule is conditional: "if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract."  30 Cal. 2d at 344-45.  This means that for a court to assess the validity of a purported assignment, there must first have been an assignment by virtue of a business's change in legal form of ownership.  While such an assignment would probably affect Plaintiff's interests under the nonassignment clause, it is entirely unclear as to whether a reverse triangular merger actually effects an assignment of a target corporation's assets.

No California state court has resolved this matter, and the Court is not inclined to guess at possible conclusions.  The Court therefore begins from the presumption that a reverse triangular merger, which leaves intact the acquired corporation, does not effect a transfer of rights from the wholly owned subsidiary to its acquirer as a matter of law.  What little applicable law there is could be analogized from California cases on stock sales, like Farmland Irrigation Co. v. Dopplmaier, 48 Cal. 2d 208, 223 (Cal. 1957), which suggested that if a plaintiff had sold all of his stock in a corporation, there could be no contention that the corporation's licenses would be extinguished as a matter of law, since the two contracting parties were still extant and in privity.

Plaintiff relies solely on SQL Solutions to argue that assignment occurred as a matter of law when an acquired corporation became another corporation's wholly owned subsidiary.  That case did not analyze nonassignment clauses and also found that federal

12

1  copyright law forbid transfer. 1991 WL 626458, at *5. In any
2  event, on this point the Court is bound by the California Supreme
3  Court's longstanding decision from Trubowitch. Accordingly, the
4  Court finds that Corthera, Novartis's wholly owned subsidiary,
5  remains licensee of Plaintiff's IP and know-how.

     **C.**   **Conversion**

The elements of a claim for conversion are (1) ownership or right to possession of property, (2) wrongful disposition of the property right, and (3) damages. Kremen v. Cohen, 337 F.3d 1024, 1029 (9th Cir. 2003). A plaintiff need not have legal ownership or absolute ownership of the property. Messerall v. Fulwider, 199 Cal. App. 3d 1324, 1329 (Cal. Ct. App. 1988). It need only allege that it is entitled to immediate possession of the property at the time of conversion. Bastanchury v. Times-Mirror Co., 68 Cal. App. 2d 217, 236 (Cal. Ct. App. 1954). However, a mere contractual right of payment, without more, will not suffice to state a claim for conversion. Farmers Ins. Exch. v. Zerin, 53 Cal. App. 4th 445, 452 (Cal. Ct. App. 1997).

If, however, "there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment," a cause of action for conversion exists. Burlesci v. Petersen, 68 Cal. App. 4th 1062, 1066 (Cal Ct. App. 1998). If money is not specifically identified, then the proper action is in contract or for debt. Baxter v. King, 81 Cal. App. 192, 194 (Cal. Ct. App. 1927).

Plaintiff's conversion claim critically fails to distinguish what Defendants converted: intellectual property, know-how, payment rights, or something else. So far as Plaintiff pleads that

13

Defendants converted Plaintiff's intellectual property rights, Plaintiff's conversion claim fails because Plaintiff has not plausibly alleged that Defendants themselves wrongly disposed of the rights in question. Plaintiff's pleadings and arguments suggest that Novartis obtained access to the intellectual property rights that Corthera licensed from Plaintiff, but nothing in Plaintiff's complaint states that Defendants themselves -- as opposed to Corthera or Novartis -- managed to dispose of Plaintiff's intellectual property. In any event, no assignment took place, so if any wrongful disposition of a property right occurred, its remedy would appear to lie against Corthera or Novartis in contract or under state and federal intellectual property laws, because, Plaintiff has failed to allege how Defendants actually caused Plaintiff's IP or know-how to be converted.

If Plaintiff is arguing that Defendants wrongfully disposed of Plaintiff's right to be paid under a contract, no conversion claim can lie for that. According to the 1998 and 2003 Agreements, Plaintiff was to be paid if Corthera entered a partnership deal, but Corthera's merger and acquisition was not such a transaction. Plaintiff has therefore not pled that it was entitled to the payments it claims Novartis made to Corthera. They fall outside the contracts that govern those parties' relationships, and Plaintiff has not adequately alleged that any payment was specifically being sent to Plaintiff.

In any event, the money at the center of Plaintiff's claim is not quite the "contractual right of payment" that California law generally forbids as the predicate for a conversion claim, but it

14

is also not a plausible enough basis to support this cause of action.  Plaintiff's allegations on this point are simply too vague and attenuated.  Moreover, Plaintiff has not pled enough to show that an equitable lien was created at any point, since it is not clear from Plaintiff's pleadings that Defendants themselves promised Plaintiff anything.  See Cnty. of L.A. v. Constr. Laborers Trust Funds for S. Cal. Admin. Co., 137 Cal. App. 4th 410, 414 (Cal. Ct. App. 2006) (equitable lien created by oral agreement where defendants were aware of reliance by plaintiff of promise of payment in exchange for work).

Plaintiff's conversion claim is DISMISSED with leave to amend, to allow Plaintiff to plead a more precise and plausible claim.

### D. Misappropriation

Plaintiff's misappropriation claim fails for the same reason as its conversion claim.[1]  Plaintiff's allegations simply do not support the charge that Defendants actually appropriated and used Plaintiff's property.  The claim is so attenuated that it fails to be plausible, and it fails to make clear exactly what Defendants -- as opposed to some other party -- took or misused, whether IP, know-how, payment, or something else.

If anyone actually appropriated or used Plaintiff's intellectual property and know-how, Plaintiff's pleadings seem to point more to Corthera or Novartis.  If Defendants are being paid for Corthera's up-front payments and milestones, then apparently

---

[1] The Court declines to entertain the parties' arguments about preemption at this point.  It is not clear that any preemption argument would be relevant to the tort claims Plaintiff makes, which do not rely solely on intellectual property claims.  In any event, Defendants raise the issue only in a footnote, a tactic both parties decry at different turns.

15

Corthera is partnering with someone and is therefore breaching the terms of its contracts with Plaintiff, or Novartis is infringing some property right. Plaintiff has not made clear why Defendants should be held liable for that by virtue of a merger, even if Plaintiff does allege that Defendants structured the sale to benefit themselves at Plaintiff's expense. This claim is DISMISSED with leave to amend for the same reasons as Plaintiff's conversion claim.

### E. Unjust Enrichment

Plaintiff also brings a claim for unjust enrichment or quasi-contract, the elements of which are (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense. Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1593 (Cal. Ct. App. 2008). Unjust enrichment is an equitable claim that sounds in implied or quasi-contract. See Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996). "The doctrine applies where plaintiffs, having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." Hernandez v. Lopez, 180 Cal. App. 4th 932, 938 (Cal. Ct. App. 2009).

Plaintiff alleges that Defendants knew of Plaintiff's contracts with Corthera but wanted to use Corthera's future work with Novartis to enrich themselves instead of Plaintiff. Plaintiff claims that in order to accomplish this, Defendants set up a merger between Novartis and Corthera that predicted Novartis having some form of access to Plaintiff's relaxin IP and know-how, but since

16

the transaction was not technically a "Partnership" per the 1998 and 2003 Agreements, Defendants -- not Plaintiff -- would receive up-front and milestone payments that could be classified instead as payments from the Merger Agreement.

First, Defendants argue that Plaintiff fails to describe a "benefit" to which it is entitled, because Corthera, not Defendants, was the party responsible for making contractual payments to Plaintiff . MTD at 18. This is not an accurate statement of Plaintiff's claim. Plaintiff's complaint fully accounts for the fact that Corthera was responsible for making payments to Plaintiff in the event of a partnership. See Compl. ¶¶ 49, 51-53, 57. The point of Plaintiff's unjust enrichment claim, however, is that Defendants set up an arrangement that would essentially work as a partnership between Corthera and Novartis, but that would be structured in a way that diverted Corthera's payments from Plaintiff to Defendants.

Second, Defendants claim that Plaintiff alleges no facts that would permit the Court to treat Novartis's payments to Defendants as benefits allegedly owed to Plaintiff under the 1998 and 2003 Agreements. MTD at 19. This is essentially a restatement of Defendants' first argument on this point, and it fails for the same reasons.

Third, Defendants argue that Plaintiff's unjust enrichment claim fails because it is governed by the express terms of a contract. MTD at 19-20. It is true that no unjust enrichment claim exists if express agreements define the parties' rights. Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94 Cal. App. 4th 151, 172 (Cal. Ct. App. 2001). But no contract

17

governing payments from Novartis to Defendants exists between Defendants and Plaintiff, who are the only parties to this action. That is the point of Plaintiff's unjust enrichment claim, and it is also the point of the unjust enrichment doctrine. See Hernandez, 180 Cal. App. 4th at 938.

Finally, Defendants contend that the Court has previously disallowed claims for unjust enrichment pled on their own and not as an alternative avenue of relief. Reply at 14 (citing Colucci v. ZonePerfect Nutrition Co., No. 12-2907 SC, 2012 WL 6737800, at *10 (N.D. Cal. Dec. 28, 2012)). That is true, but Plaintiff need not use the magic word "alternatively" to indicate that its claim was made in the alternative. See Fed. R. Civ. P. 8; Coleman v. Standard Life Ins. Co., 288 F. Supp. 2d 1116, 1120 (E.D. Cal. 2003) ("Under Rule 8, plaintiff need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [he was] doing.") (internal citations and quotations omitted). The Court finds that Plaintiff's claim for unjust enrichment was made in the alternative to its conversion and misappropriation claims, and declines to dismiss this cause of action on a technicality.

Defendants' motion to dismiss Plaintiff's unjust enrichment claim is therefore DENIED.

**F. Constructive Trust**

Plaintiff asserts a cause of action for constructive trust against Defendants. "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." Burlesci v. Peterson, 68 Cal. App. 4th 1062,

1069 (Cal. Ct. App. 1998). It is an equitable remedy to prevent unjust enrichment. See id.; see also Malfatti v. Mortg. Elec. Registrations Sys., Inc., No. C 11-03142 WHA, 2011 WL 5975055, at *3 (N.D. Cal. Nov. 29, 2011) (constructive trust is a remedy, not a claim for relief). Defendants move to dismiss the claim on the grounds that a constructive trust is a remedy, not a claim. MTD at 20-21.

The Court agrees with Defendants. Plaintiff's constructive trust claim must be dismissed because a constructive trust is only a remedy. Defendants' motion to dismiss Plaintiff's claim for constructive trust is GRANTED with prejudice, but Plaintiff has leave to clarify its request for constructive trust as a remedy.

## V.   CONCLUSION

For the reasons described above, the Court GRANTS in part and DENIES in part the above-captioned Defendants' motion to dismiss Plaintiff Florey Institute of Neuroscience and Mental Health's complaint. Plaintiff's unjust enrichment claim is undisturbed. All other claims are DISMISSED. Plaintiff has thirty (30) days from this Order's signature date to file an amended complaint, if it chooses to do so. Failure to file an amended complaint may result in the deficient claims being dismissed with prejudice.

IT IS SO ORDERED.

Dated: September 26, 2013

UNITED STATES DISTRICT JUDGE

19