1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9                                      )  Case No. CV 12-6504 SC
                                       )
10  THE FLOREY INSTITUTE OF            )  ORDER GRANTING MOTIONS TO
    NEUROSCIENCE AND MENTAL HEALTH,    )  DISMISS
11                                     )
            Plaintiff,                 )
12                                     )
        v.                             )
13                                     )
    KLEINER PERKINS CAUFIELD &         )
14  BYERS, KPCB HOLDINGS, INC.,        )
    DOMAIN ASSOCIATES, LLC, DOMAIN     )
15  PARTNERS V, L.P., DP V             )
    ASSOCIATES, L.P., DOMAIN           )
16  PARTNERS VII, L.P., DP VII         )
    ASSOCIATES, L.P., SEARS CAPITAL    )
17  MANAGEMENT, LOWELL SEARS,          )
    Individually and as Trustee of     )
18  The Sears Trust and The Sears      )
    Trust Dated 3/11/91, CAXTON        )
19  ADVANTAGE VENTURE PARTNERS,        )
    L.P., CAXTON ADVANTAGE LIFE        )
20  SCIENCES FUND, L.P., STANLEY E.    )
    ABEL, PETER M. BREINING, and       )
21  THOMAS G. WIGGANS,                 )
                                       )
22          Defendants.                )
    _____   )

23

24

25  I.   **INTRODUCTION**

26       Now before the Court is the above-captioned Defendants'

27  motions to dismiss Plaintiff the Florey Institute of Neuroscience

28  and Mental Health's ("Plaintiff") first amended complaint.  ECF No.

United States District Court
For the Northern District of California

43 ("FAC").  All Defendants except Thomas G. Wiggans join in one motion to dismiss, ECF No. 53 ("KPCB MTD"), while Mr. Wiggans filed his own motion, ECF No. 77 ("Wiggans MTD").[1]  The motions are fully briefed.[2]  The Court finds the matter appropriate for resolution without oral argument.  Civ. L.R. 7-1(b).  As discussed below, the motions are GRANTED.[3]

## II.   BACKGROUND

The Court summarized the facts of this case in its September 26, 2013 Order.  ECF No. 41 ("Sept. 26 Order").  It repeats some of the germane facts below, followed by a procedural summary.

### A.   Factual Background

In 1982, Plaintiff entered a research collaboration and IP licensing agreement with Genentech.  FAC ¶¶ 28-31.  The agreement concerned Plaintiff's extensive work on the relaxin peptide, whose many uses include treating acute heart failure.  Id. ¶¶ 1-11.  In 1993, Genentech established a separate entity that became Connectics Corporation ("CNCT").  Id. ¶ 32.  CNCT was tasked with working on Genentech's relaxin projects.  Id.  That same year, Plaintiff granted Genentech's request to sublicense Plaintiff's

---

[1] The FAC adds Defendants KPCB Holdings, Inc.; Domain Partners V, L.P.; DP V Associates, L.P.; Domain Partners VII, L.P.; DP VII Associates, L.P.; Lowell Sears (individually and as trustee); and Caxton Advantage Life Sciences Fund, L.P.  The parties and the Court refer to these Defendants as the "New Defendants," as opposed to the "Original Defendants" named in Plaintiff's original complaint, ECF No. 1.

[2] ECF Nos. 70 ("Opp'n to KPCB"), 74 ("Reply to KPCB"), 79 ("Opp'n to Wiggans MTD"), 80 ("Wiggans Reply").

[3] Both motions to dismiss also include requests to strike portions of the FAC.  Since the Court has granted the motions to dismiss, the motions to strike are DENIED AS MOOT.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

intellectual property to CNCT, as it was required to do under the contract at the time.  Id. ¶ 34.  In 1994 that agreement was replaced by an amendment that granted Genentech the right to receive royalties on any licensed product sales by CNCT, and CNCT in turn agreed to pay Plaintiff royalties and other payments that would be due from Genentech per the 1982 Agreement.  Id. ¶ 30.

In 1995, CNCT informed Plaintiff in a letter from Defendant Wiggans (then the CNCT CEO and president) that it wanted to enter a new research agreement with Plaintiff.  Id. ¶ 35.  CNCT wanted to reduce the royalty rate under the existing contracts, because it believed the high rate would deter corporate drug-development partners, so it proposed reducing the royalty rate and adding terms that would give Plaintiff a share of future up-front and milestone payments paid by CNCT's future drug-development partners.  Id. CNCT and Plaintiff negotiated between 1995 and 1998, after which they reached an agreement.  Id. ¶¶ 32-35 & Ex. 1 ("1998 Agreement").  The 1998 Agreement reduced future royalty payments, but guaranteed Plaintiff 1 percent of future up-front payments and 15 percent of later milestone payments.  Id. ¶ 38; 1998 Agreement § 5.2.

During the negotiations, Plaintiff expressed concerns that CNCT might try to avoid future payment obligations by structuring future drug development agreements and related payments to avoid the parties' intent.  Id. ¶ 38.  Plaintiff contends that it sought assurances to this effect from CNCT, after which "CNCT reassured [Plaintiff] that its concerns were unfounded, stating that CNCT would not attempt to convince a drug development company partner to restructure any future payments so as to avoid the duty to

3

United States District Court
For the Northern District of California

compensate [Plaintiff] for its relaxin know-how and related patent rights, and also pointed out that the duty to compensate [Plaintiff] would be apparent from the structuring of any future relationships and the nature, timing, and conditions for future payments from any drug development partner." Id. ¶ 38.  The 1998 Agreement includes no clause to that effect, but Plaintiff states that it relied on CNCT's statements in entering the 1998 Agreement and agreeing to its licensing and royalty provisions.  Id.

In 2001, CNCT ceased its development efforts after its clinical trials for scleroderma -- its focus on relaxin research up to that point -- were deemed unsuccessful. Id. ¶¶ 45-46.  In 2002, CNCT's relaxin team established a new commercial entity, Corthera (at first called BAS Medical, Inc.). Id.  In 2003, Defendants Kleiner Perkins and Breining, a Corthera founder, approached Plaintiff to seek assignment of the relaxin-related license from CNCT to Corthera. Id. ¶¶ 46-47.

In July 2003, Corthera negotiated an amendment to the 1998 Agreement that extended the agreement's terms, permitted assignment of CNCT's rights and obligations under the 1998 Agreement to Corthera, and further reduced Plaintiff's royalty rates to 2 percent of net sales. Id. ¶¶ 48-49 & Ex. 2 ("2003 Amendment").[4] The 1 percent up-front payments and 15 percent milestone payments, described in the 1998 Agreement, would remain the same. Id. Corthera's rationale for negotiating these changes was the same as CNCT's: it was too small to commercialize relaxin itself, so it needed to license Plaintiff's IP and know-how to a bigger partner,

---

[4] Collectively, the 1998 Agreement and 2003 Amendment are the "Agreements."

United States District Court
For the Northern District of California

1  which might balk at the royalty payments -- thus the change in

2  payment terms.  See id.  Concurrently with the spring 2003

3  negotiations, Corthera brokered an agreement with CNCT for the

4  assignment of CNCT's rights under the 2003 Amendment, and shortly

5  after Plaintiff had agreed to that Amendment, Corthera announced

6  that CNCT had assigned to Corthera its worldwide rights to relaxin.

7  Id. ¶ 50.  Plaintiff contends that after Corthera had obtained

8  Plaintiff's IP rights, Defendants made substantial investments to

9  Corthera.  Id.

10  From 2003 through 2009, Plaintiff and Corthera collaborated on

11  relaxin research.  Id. ¶¶ 51-52.  Plaintiff alleges that throughout

12  this time, Defendants knew that Plaintiff was working on Corthera's

13  relaxin projects and that Plaintiff had granted Corthera a license

14  to its relaxin patents in expectation of future payments.  See ¶

15  52.  During this period, in 2007, Corthera hired Defendant Abel as

16  its new CEO and changed its focus from dermatology applications to

17  cardiovascular treatments.  Id. ¶ 53.  In May 2008, Corthera

18  reported that ongoing clinical trials indicated that relaxin could

19  prove beneficial for cardiac treatment, and in March 2009, Corthera

20  completed those clinical trials, demonstrating positive results for

21  relaxin in patients with acute heart failure.  Id. ¶¶ 54-55.  It

22  initiated phase III clinical trials in October 2009.  Id.

23  Shortly thereafter, in December 2009, Plaintiff learned from a

24  press release issued by Corthera's outside counsel, Kaye Scholer,

25  that the pharmaceutical company Novartis had agreed to purchase

26  Corthera up-front for $120 million in cash, characterized as a

27  stock-purchase agreement that would leave Corthera as a wholly

28  owned subsidiary of Novartis.  Id. ¶ 56 & Ex. 3 ("Dec. Press

United States District Court
For the Northern District of California

1  Release").  Under the Novartis-Corthera agreement, Novartis was to

2  make additional milestone payments of up to $500 million to the

3  Corthera shareholders (not Corthera itself).  <u>Id.</u>  In January 2010,

4  Novartis purchased all of Corthera's stock, and its outside counsel

5  issued a press release stating that Novartis had acquired

6  "exclusive worldwide rights to relaxin . . . through the

7  acquisition of . . . Corthera, Inc."  <u>Id.</u> Exs. 4 ("Novartis

8  Agreement"), 5 ("Kaye Scholer Press Release").  Up to that point,

9  Defendants controlled most of Corthera's stock, comprised a

10  majority of Corthera's board, and controlled and directed

11  Corthera's entry into the Novartis Agreement.  <u>Id.</u> ¶¶ 56-63.

12  Defendant Wiggans was also on Corthera's board during this time.

13  <u>Id.</u> ¶ 35.

14      **B.**   **<u>Procedural Background</u>**

15      Plaintiff originally pled four causes of action against all

16  Defendants except the New Defendants and Mr. Wiggans: (1)

17  conversion, (2) misappropriation, (3) unjust enrichment, and (4)

18  constructive trust.  Defendants moved to dismiss, and the Court

19  granted that motion in part and denied it in part.  Sept. 26 Order

20  at 1.

21      The Court held, first, that no assignment occurred in the

22  Corthera-Novartis deal as a matter of law.  <u>Id.</u> at 12-13.  Second,

23  as to conversion, the Court held that Plaintiff failed to state a

24  claim because it did not sufficiently plead what Defendants had

25  allegedly converted: IP or some unspecified payment right.  <u>See id.</u>

26  at 13-14.  Third, the Court held that Plaintiff failed to state a

27  claim for misappropriation because its pleadings were unacceptably

28  vague as to what had been misappropriated and who misappropriated

it, partly because Plaintiff's misappropriation claim relied on its conversion claim.  Id. at 14-16.  Finally, the Court rejected Defendants' motion to dismiss Plaintiff's unjust enrichment claim in part because Defendants had mischaracterized Plaintiff's claim, rendering their arguments inapposite.  See id. at 16-17.  The Court allowed Plaintiff to plead the unjust enrichment claim in the alternative.  Id. at 18.

Now, based on the facts described above from Plaintiff's FAC, Plaintiff asserts four causes of action against Defendants: (1) conversion of intellectual property, (2) conversion of proceeds owed to Plaintiff, (3) misappropriation, and (4) unjust enrichment under quasi-contract.  Defendants move to dismiss.  The two motions to dismiss now focus primarily on whether Plaintiff has stated claims under those four causes of action, and whether Plaintiff's claims might be preempted by various intellectual property laws.

## III.  **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint

1  is inapplicable to legal conclusions.  Threadbare recitals of the

2  elements of a cause of action, supported by mere conclusory

3  statements, do not suffice." Id. (citing Bell Atl. Corp. v.

4  Twombly, 550 U.S. 544, 555 (2007)).

5

6  **IV.   DISCUSSION**

7       **A.   Rule 8**

8       Plaintiff's allegations against the New Defendants, including

9  Defendant Wiggans, fail under Rule 8.  In making this conclusion,

10  the Court relies on a close reading of Plaintiff's complaint and

11  controlling Supreme Court precedent.  "Determining whether a

12  complaint states a plausible claim for relief will . . . be a

13  context-specific task that requires the reviewing court to draw on

14  its judicial experience and common sense." Iqbal, 556 U.S. at 679.

15  "[W]here the well-pleaded facts do not permit the court to infer

16  more than the mere possibility of misconduct, the complaint has

17  alleged -- but has not 'show[n]' -- 'that the pleader is entitled

18  to relief.'" Id.  (quoting Rule 8, alterations in the original).

19       In this case, Defendants did not originally challenge

20  Plaintiff's pleadings under Rule 8.  This time they do, though it

21  is unclear whether Defendants raise it for both the Original and

22  New Defendants, or just for the New Defendants.  See KPCB MTD at

23  11-12; KPCB Reply at 1.  Defendant Wiggans raises the issue for

24  himself.  Wiggans Reply at 3.  As to all Defendants except the New

25  Defendants and Defendant Wiggans, the Court rejects the Rule 8

26  challenge.

27       However, Plaintiff's pleadings are factually deficient as to

28  the New Defendants and Defendant Wiggans, because while Plaintiff

**United States District Court**
For the Northern District of California

8

**United States District Court**
For the Northern District of California

explains who those Defendants are, none of Plaintiff's allegations explain what they did or why it was wrong in a way specific enough to satisfy Rule 8.  While Plaintiff explains, for example, what Defendant Wiggans's roles were, FAC ¶¶ 23, 32, and that he communicated with Plaintiff about changes to the payment structure in the agreements, id. ¶ 35, made statements about the CNCT-Corthera license, id. ¶ 50, and was a member of Corthera's board, id. ¶ 58, at no point does the FAC plausibly explain how Defendant Wiggans did anything actionable.

Further, there is virtually nothing specific in the FAC as to what the New Defendants did.  Plaintiff states that it added those parties because they held significant stock in Corthera and received most of the payments made by Novartis, but this is hardly actionable behavior.

Plaintiff's claims as to the New Defendants and Defendant Wiggans are DISMISSED.  As explained below, since Plaintiff also fails to state claims against any Defendant regardless of whether Plaintiff satisfied Rule 8 as to Defendant Wiggans or the New Defendants, the dismissal is WITH PREJUDICE.

**B.   Conversion**

Plaintiff previously claimed that Defendant converted an undifferentiated mix of intellectual property and rights to payment.  Plaintiff now divides its conversion claim into two parts: conversion of intellectual property, and conversion of proceeds owed to Plaintiff.

A conversion claim arises where there is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  Weiss v. Marcus, 51 Cal.

**United States District Court**
For the Northern District of California

App. 3d 590, 599 (Cal. Ct. App. 1975).  Neither legal title nor absolute ownership of the property in question is necessary for a conversion claim -- "[a] party need only allege it is entitled to immediate possession at the time of conversion." <u>Plummer v. Day/Eisenberg, LLP</u>, 184 Cal. App. 4th 38, 45 (Cal. Ct. App. 2010). Further, "[m]oney cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment." <u>PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP</u>, 150 Cal. App. 4th 384, 395 (Cal. Ct. App. 2007).  While "a mere contractual right of payment, without more, will not suffice" to establish conversion, courts have recognized a sufficient ownership interest when the plaintiff has a lien on the funds in question.  <u>Farmers Ins. Exch. v. Zerin</u>, 53 Cal. App. 4th 445, 452 (Cal. Ct. App. 1997); <u>see also Weiss</u>, 51 Cal. App. 3d at 598 (finding that the plaintiff had a conversion claim where the plaintiff had a lien on the proceeds of a settlement).

The elements of a claim for conversion are (1) ownership or right to possession of property, (2) wrongful disposition of the property right, and (3) damages.  <u>Kremen v. Cohen</u>, 337 F.3d 1024, 1029 (9th Cir. 2003).  A plaintiff need not have legal ownership or absolute ownership of the property.  <u>Messerall v. Fulwider</u>, 199 Cal. App. 3d 1324, 1329 (Cal. Ct. App. 1988).  It need only allege that it is entitled to immediate possession of the property at the time of conversion.  <u>Bastanchury v. Times-Mirror Co.</u>, 68 Cal. App. 2d 217, 236 (Cal. Ct. App. 1954).

///

#### i.   <u>Conversion of Intellectual Property</u>

Plaintiff's conversion of intellectual property claim is premised on Defendants' alleged disposal of Plaintiff's domestic and foreign relaxin patents, as well as of Plaintiff's relaxin-related know-how.  FAC ¶¶ 70-72.  Defendants allegedly accomplished this by giving, transferring, and assigning to Novartis, "by implication if not expressly, the right to use [Plaintiff's] know-how" in a way that denied Plaintiff compensation, and also by depriving Plaintiff of its exclusive right to license its foreign and domestic patents.  <u>Id.</u> ¶¶ 72-75.

Plaintiff first acknowledges that the Court held in its September 26 Order that a reverse triangular merger does not necessarily effect assignment as a matter of law from the acquired company to its acquirer.  Opp'n to KPCB at 12 (citing Sept. 26 Order at 12-13).  Plaintiff now argues that it sufficiently alleged assignment as a matter of fact or assignment by implication, meaning that Defendants objectively intended to transfer Plaintiff's rights from Corthera to Novartis.  <u>Id.</u> at 12-13.  On this point, Plaintiff continues to rely on an assignment theory, stating that regardless of the Court's holding on assignment as a matter of law, Defendants effected an assignment in fact, or an assignment by implication, of Plaintiff's licensed intellectual property from Corthera to Novartis.  <u>Id.</u> at 13-14.

Defendants respond that "assignments in fact" or "implied assignments" do not exist as legal concepts, and that Plaintiff is barred from raising the issue due to the Court's prior order on the assignment issue.  KPCB Reply at 6-7.  Defendants also contend that because Plaintiff contradicts itself in asserting that any

**United States District Court**
For the Northern District of California

assignment was ineffective regardless of intentions, the claim for conversion of intellectual property must fail.  Id. at 7 (citing Opp'n to KPCB at 12-13 & n.3).  Further, Defendants note that the Merger Agreement itself states that Corthera would use diligent efforts to develop and sell pharmaceuticals, and contend that nothing in that Agreement says anything about Novartis itself developing or having the right to develop a relaxin-based drug, indicating that Corthera remains licensee and no intellectual property has been either assigned or converted.  See id. at 7-8 (citing Merger Agreement ¶ 9.3).  Finally, Defendants dispute Plaintiff's interpretation of the 2003 Amendment as voiding any transfer without Plaintiff's consent, because part of that contract permits non-consensual assignment in the event of a complete stock purchase.

As a threshold issue, the Court does not find that its holding on assignment as a matter of law would necessarily bar Plaintiff from making a different argument about assignment.  The original round of briefing on this matter concerned whether the reverse triangular merger itself effected an assignment, not whether an assignment could have occurred by other means.

However, the Court does not find Plaintiff's new position convincing.  Plaintiff contends that Defendants assigned Corthera's license as a matter of fact.  But in the same section Plaintiff maintains that "such an assignment, while clearly intended by Defendants and Novartis, was ineffective," based on Section 6.6 of the 2003 Amendment's provision non-assignment clause, which voids assignments made without Plaintiff's consent (with exceptions, noted below).  Opp'n to KPCB at 12 & n.3.  In this context,

Plaintiff contradicts itself to the point of implausibility. Plaintiff's theory depends on an assignment or transfer having taken place, but Plaintiff's position is that no assignment was possible under any circumstances.  See FAC ¶¶ 56, 61, 65, 70, 72.

Plaintiff and Defendants also raise the issue of Section 6.6(b), which reads in relevant part:

> [E]ither party may assign, upon written notice to the other, both the rights and obligations of the [1998 Agreement] to the surviving corporation ("Surviving Party") in any acquisition, merger or consolidation to which it is a party or to any person who acquires all or substantially all of its capital stock or assets or of the assets of that portion of such party's business as to which the [1998 Agreement] pertains so long as such party (i) is reasonably determined to be financially able to fulfill its obligations under this Agreement; and (ii) does not materially impair the reputation of [Plaintiff].

Plaintiff states that nothing in that exception would preclude Plaintiff from being entitled to its share of payments in the event of a partnership agreement.  Opp'n to KPCB at 15 n.6.  That might be true, but Plaintiff pled that it never received notice under Section 6.6 or any other provision, and Plaintiff's argument is not that a partnership agreement took place -- its position has always been that the merger was a ruse for Corthera and Novartis to become "partners" without legally triggering the payment provision of the contract.[5]  Under Section 6.6(b), given Plaintiff's position on notice, any purported assignment based on a stock purchase remains void, in which case Plaintiff's conversion claim fails for the reason stated above: there was never any assignment, so Corthera

---

[5] To the extent Defendants contend that they did in fact provide notice to Plaintiff pursuant to Section 6.6(b), that is a factual dispute not suitable for decision on a motion to dismiss because Plaintiff denies receiving notice.

**United States District Court**
For the Northern District of California

1  remains licensee.  Neither of Plaintiff's arguments as to

2  assignment are effective, and without further explanation its

3  pleadings that Defendants gave, transferred, or assigned

4  Plaintiff's patents and know-how to Novartis are impermissibly

5  conclusory.

6      Even if the Court were to evaluate the entire transaction and

7  the parties' conduct, as Plaintiff states is necessary per McCown

8  v. Spencer, 8 Cal. App. 3d 216, 225 (Cal. Ct. App. 1970),

9  Plaintiff's assignment theory is ineffective.  If Plaintiff is

10  asserting that Defendants accomplished the assignment via the

11  merger alone, they are wrong, and the assignment is void for the

12  reasons explained in the September 26 Order.  Sept. 26 Order at 10-

13  12.  If Plaintiff is arguing instead that, merger aside, the

14  transaction and the parties' conduct effected an assignment, then

15  the Agreements Plaintiff attached to its FAC contradict Plaintiff's

16  pleadings, because they explain unambiguously what the effects of a

17  putative assignment would be.

18      The Court also does not find, contrary to Plaintiff's

19  suggestion, that Section 9.3(a) of the Merger Agreement constitutes

20  an assignment, since it says only that Novartis and the "Surviving

21  Corporation" (Corthera, post-merger) would use diligence to achieve

22  milestones.  It does not state that Novartis acquires any of

23  Corthera's rights as a result of the merger.  Merger Agreement §

24  9.3(a).  Third-party press releases are not convincing here,

25  especially when Plaintiff's pleadings do not support the conclusion

26  Plaintiff asks the Court to draw.

27      Finally, to the extent Plaintiff suggests that the Corthera-

28  Novartis merger itself effected an assignment, the Court's

14

September 26 Order on that issue is law of the case.  The Court declines to revisit it.

Plaintiff does not further explain how its pleadings, absent an assignment theory, indicate how Defendants had anything to do with the conversion of Plaintiff's intellectual property rights. Plaintiff continues to rely on Defendants' alleged role in the Novartis merger.  Opp'n at 14-15 (citing FAC ¶¶ 35-36, 38-40, 44, 46-51, 56-58-63, 72).  Plaintiff has alleged nothing concerning its intellectual property distinct from the merger, so it appears that nothing else in Plaintiff's FAC could support a conversion of intellectual property claim.  Beyond these allegations, Plaintiff's claims are implausible, impermissibly vague, and fail to state a claim -- the only plausible inference as to conversion of intellectual property, based on Plaintiff's facts, would point toward Plaintiff suing Corthera or Novartis, not Defendants.  The Court declines to address the parties' preemption arguments at this time.

Plaintiff's conversion of intellectual property claim is DISMISSED WITH PREJUDICE, because the Court finds that further amendment on this claim would be futile.

### ii.   **Conversion of Proceeds Owed**

Plaintiff's claim for conversion of proceeds owed is based on Plaintiff's alleged reliance on Defendants' promise that Plaintiff would receive the agreed percentages of up-front and milestone payments from drug development partners, per the Agreements.  FAC ¶ 77.  Plaintiff pleads that it relied on those representations, and that both parties conducted themselves in accordance with the earlier promises and expectations.  Id. ¶¶ 78-79.  Defendants

**United States District Court**
For the Northern District of California

characterize Plaintiff's claim for conversion of proceeds owed as
being an impermissible attempt to recover a right of payment under
the Agreements, which is barred by California law.  Defendants also
contend that Plaintiff's claims are barred by the Agreements'
integration clause and the parol evidence rule.  Plaintiff responds
that its claims are not based on the Agreements, that the parol
evidence rule does not foreclose its claims primarily because they
are not based on the Agreements, and that the integration clause
does not bar its claims because of the same reasons and because
Defendants are not parties to the Agreements.  See Opp'n to Wiggans
at 12-19; Opp'n to KPCB at 15-19.  Plaintiff also contends that the
Court should interpret its conversion of proceeds claim as a claim
for the imposition of an equitable lien, or alternatively as a
claim for monies had and received.  Opp'n at 16 & n.8.[6]

Money cannot be the basis of a cause of action for conversion
unless there is a "specific, identifiable sum involved, such as
where an agent accepts a sum of money to be paid to another and
fails to make the payment." PCO, Inc., 150 Cal. App. 4th at 395.
Mere contractual rights to payment are not enough to establish
conversion, but in some cases courts have recognized ownership
interests if plaintiffs have a lien on the funds, which is what
Plaintiff now argues.  See Zerin, 53 Cal. App. at 452.  Equitable
liens can arise from a contract that reveals the intent to charge a
particular property with a debt.  Zerin, 53 Cal. App. 4th at 453-

[6] Defendant Wiggans argues that Plaintiff's latter position is an
improper attempt to amend its pleadings through an opposition
brief.  Wiggans Reply at 8-10; Reply at 9-12.  The Court disregards
the procedural argument because, as the parties' briefs explain,
the merits of Plaintiff's equitable lien theory are resolvable at
this time.

**United States District Court**
For the Northern District of California

454.  The question of whether a lien has actually been created under a contract depends upon the facts of the case, including questions of detrimental reliance or unjust enrichment.  Id.

Plaintiff relies primarily on an analogy to McCafferty v. Gilbank, 249 Cal. App. 2d 569, 575 (Cal. Ct. App. 1967), in which a plaintiff had been contractually promised payment from the proceeds of her husband's personal injury action, and in reliance on that promise she had failed to file a judgment lien in that action.  The Court of Appeal held that the plaintiff had an equitable lien on the litigation recovery enforceable against the defendant, plaintiff's husband's attorney, who had made the promise to the plaintiff and drafted the contract guaranteeing plaintiff proceeds from the personal injury action.  Id. at 575-76.

The Court does not find McCafferty an apt analogy to this case.  While the defendant in McCafferty was, like Defendants here, not himself a party to any contract, he promised plaintiff a specific portion of a specific payment, and drafted a contract to that effect.  Id. at 575-76.  Here, Plaintiff alleges at most that in 1997, an unnamed representative of CNCT promised Plaintiff that future payments from drug-development partners would not be characterized in ways that avoided paying Plaintiff the agreed percentage under the Agreements, and that any future duty to compensate Plaintiff would be clear from the structure of future relationships and the nature, timing, and conditions for future payments from drug-development partners.  FAC ¶ 38.  Plaintiff also claims that Defendant Breining and an unnamed representative of CNCT later reiterated that the Agreements' up-front and milestone payment structures would be preserved.  Id. ¶ 49.  This does not

17

**United States District Court**
For the Northern District of California

1   come close enough to <u>McCafferty</u> -- the proper analogy would arise

2   if a Defendant had informed Plaintiff of Corthera's impending

3   acquisition, told Plaintiff that it was entitled to a portion of

4   the acquisition price, and then refused to pay Plaintiff.  In any

5   event, it is not clear how promising that the Agreements' payment

6   structures would be preserved would be actionable here: they were

7   preserved.  Plaintiff's other cases, <u>see</u> Opp'n to KPCB at 16, are

8   similarly inapposite to this case.

9        Further, Plaintiff has not established that Defendants, as a

10  virtually undifferentiated group, all knew about the vague promises

11  made in the 1998 Agreement or 2003 Amendment negotiations,

12  especially when Defendants all enter and exit this fact pattern at

13  various times, having come and gone as board members, employees, or

14  investors at times not always made clear in the FAC.  Neither

15  equity nor the facts support this, especially since Plaintiff first

16  contended that it was the CEO of CNCT who had made the promise, but

17  Plaintiff now pleads more vaguely that it was "CNCT" who

18  "reassured" Plaintiff about future payments, which does not support

19  the contention either that Defendants themselves knew of any

20  promise, or that it is plausible for the Court to find that any

21  Defendant promised Plaintiff anything particular at all.

22  Plaintiff's FAC fails to allege reasonable or plausible grounds for

23  inferring that Defendants made a promise to Plaintiff at all,

24  especially one that would entitle Plaintiff to payments never

25  described in the Agreements.

26       Finally, in terms of equity, if Plaintiff were seeking

27  recovery of Partner payments against Corthera or Novartis its

28  theory would be more plausible, but as pled here it appears to be

**United States District Court**
For the Northern District of California

1   an attempt to avoid those avenues for repayment.  See Zerin, 53

2   Cal. App. 4th at 456-57 (distinguishing between express and

3   implicit promises to pay from a fund, and attempts to avoid seeking

4   repayment from proper parties).  Under these circumstances, the

5   Court does not find that the equities require the existence of an

6   equitable lien.  First, the Court now finds that all of Plaintiff's

7   theories for recovery arise from the Agreements, suggesting to the

8   Court that Plaintiff is simply avoiding pursuing adequate remedies

9   at law against the more apt parties for recovery (e.g., breach of

10  contract or infringement of intellectual property claims).  See

11  Farmers Ins. Exch. v. Smith, 71 Cal. App. 4th 660, 671 (Cal. Ct.

12  App. 1999) (finding same); Zerin, 53 Cal. App. 4th at 456-57.

13  Second, it is inequitable to impose a lien in situations like this

14  one essentially because Plaintiff is able to allege, without much

15  more, a vague promise to do something other than what the contract

16  says.  In fact, the negotiations surrounding the Agreements all

17  indicate that there was no intent to charge Defendants with a debt

18  (e.g., payment to Plaintiff in the event of an acquisition

19  purportedly undertaken to take the place of a "Partnership"),

20  because the Agreements are integrated and contain no such apparent

21  intention or contractually memorialized promise.  See Zerin, 53

22  Cal. App. 4th at 453-454.

23       Separately, the Court rejects Plaintiff's footnotes argument

24  that the Court should interpret its conversion of proceeds claim as

25  a claim for money had and received.  Opp'n at 16 n.8.  The Court

26  agrees that plaintiffs need not correctly name each of their

27  actions so long as the facts alleged support a claim, Self Directed

28  Placement Corp. v. Control Data Corp., 908 F.2d 464, 466 (9th Cir.

1  1990), but here the Court does not find that Plaintiff's FAC states

2  a claim for money had and received.  Such a claim is founded on the

3  unjust enrichment of a defendant by its receipt of a definite sum

4  to which the plaintiff was justly entitled.  <u>Bastanchury v. Times-</u>

5  <u>Mirror Co.</u>, 68 Cal. App. 2d 217, 236 (Cal. Ct. App. 1945).  As

6  above, the Court does not find such an entitlement here: Plaintiff

7  has not pled that there is a specific sum to which it is entitled,

8  only that a different amount of money should have been

9  characterized as a payment under a different contract, which is not

10 the point of either a conversion claim or a claim for money had and

11 received -- which appear to be the same claims stated in different

12 ways.

13    Plaintiff's conversion of payment owed claim is DISMISSED WITH

14 PREJUDICE, since amendment would be futile.

15    **C.**   **<u>Parol Evidence</u>**

16    Apart from the legal and pleading deficiencies described

17 above, Plaintiff's arguments based on promises allegedly made

18 during negotiations for the 1998 Agreement and 2003 Amendment are

19 barred by the parol evidence rule.  Plaintiff argues first that

20 Defendants do not have standing to rely on the parol evidence rule,

21 since they were not parties to the Agreements.  Plaintiff also

22 contends that if the Court finds the parol evidence rule

23 applicable, it still does not bar Plaintiff's theory because

24 Plaintiff's claims are not based on the Agreements, that its theory

25 based on the earlier promises would not modify the Agreements (even

26 if they are integrated), and that the Court should admit parol

27 evidence to interpret the terms of the Agreement.

28    As a threshold matter, Plaintiff contends that Defendants

**United States District Court**
For the Northern District of California

1  cannot raise an argument based on the integration clause because

2  they are not parties to the Agreements.  Opp'n at 8-9.  The Court

3  rejects this argument.  Plaintiff is suing Defendants based on the

4  Agreements, and Plaintiff's authority does not support its position

5  that non-parties cannot invoke the parol evidence rule or

6  integrated contracts when the contracts are central to the issue at

7  hand.  See Thomson v. Canyon, 198 Cal. App. 4th 594, at 609 (Cal.

8  Ct. App. 2011) (holding the parol evidence rule applicable where

9  contractual obligations are at issue, but noting that in some

10  cases, it is unclear whether third parties can rely on the rule).

11  Defendants' cases, however, support the conclusion that a non-party

12  can raise these issues in its defense, in certain situations.  Kern

13  Cnty. Water Agency v. Belridge Water Storage Dist., 18 Cal. App.

14  77, 86 (Cal. Ct. App. 1993)(noting that a 1978 amendment to

15  California Code of Civil Procedure section 1856 deleted the parol

16  evidence rule's limitation to actions involving contractual

17  parties, and holding that the non-party litigants could rely on the

18  parol evidence rule in a contract interpretation dispute).  Thomson

19  is more recent than Kern, but it is inapposite.  The Thomson

20  court's discussion of the parol evidence rule in that case

21  concerned whether a defendant in a tort case could rely on the

22  parol evidence rule to exclude facts suggesting that it breached a

23  duty to plaintiff, but the court never questioned the parol

24  evidence rule's applicability to disputes that arise over contract

25  interpretation.

26      Substantively, Plaintiff's first two arguments are addressed

27  in the venerable Supreme Court case Seitz v. Brewers' Refrigerating

28  Machine Co., 141 U.S. 510, 517 (1891):

> Undoubtedly, the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if, under the circumstances of the particular case, it may properly by inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as import a complete legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing.

In other words, extrinsic evidence relating to a term not actually included in a contract -- like a promise made during a negotiation -- is sometimes permissible if the contract is not integrated and the evidence concerns a matter distinct from the contract. See id. But if that evidence is "so closely connected with the principal transaction as to form part and parcel of it," and the agreement is integrated, the evidence is barred. See id.

Plaintiff's first argument -- that the parol evidence rule is inapplicable because Plaintiff's claims and the underlying promises are not based on the Agreements -- appears compelling at first, since the parties do not focus on how the parol evidence rule might apply to extrinsic evidence relating to terms that are not actually in the contract. However, Seitz addresses that, as explained above. The right of payment and the intellectual property on which Plaintiff bases its claims are part and parcel of the Agreements, and they would not exist without these contracts. Moreover, the Agreements are integrated, and the parties clearly cognizes the import of a merger or acquisition both before enacting either

**United States District Court**
For the Northern District of California

1  Agreement and in the Agreements themselves.  The parol evidence

2  rule bars Plaintiff's reliance on promises allegedly made during

3  the negotiations to impose payment terms other than those included

4  in the Agreements.

5      Plaintiff's second argument, that Defendants' alleged promises

6  not to structure future arrangements in ways that would evade the

7  Agreements do not modify or contradict the Agreements, is also

8  incorrect.  First, to the extent that Plaintiff seeks to use the

9  1998 and 2003 promises as extrinsic evidence supporting an

10 interpretation of the Corthera-Novartis deal as a "Partnership"

11 under the Agreements, thereby triggering a payment obligation,

12 Plaintiff's theory would modify or contradict the Agreements, which

13 are clear and not capable of Plaintiff's new interpretation.  The

14 Agreements, as noted above, cognize both partnerships and

15 acquisitions, and per Plaintiff's pleadings, the negotiating

16 parties discussed but did not include clauses governing the

17 situation that has now arisen between these parties.  Second,

18 because the promises on which Plaintiff bases its claims were

19 clearly topics of discussion during the Agreements' negotiations,

20 Plaintiff's reliance on the promises for its licensing and payment

21 theories would modify the Agreements by adding terms specifically

22 discussed but not added to the Agreements.

23     Finally, Plaintiff's third argument -- that the Court should

24 admit extrinsic evidence to interpret the Agreements -- is wrong.

25 The Agreements are not reasonably susceptible of the meaning

26 Plaintiff proffers.  See Brinderson-Newberg Joint Venture v. Pac.

27 Erectors, Inc., 971 F.2d 272, 278 (9th Cir. 1992).  The Court finds

28 unconvincing Plaintiff's contention that the promises and the

**United States District Court**
For the Northern District of California

1    parties' behavior elucidate the "Partner" term or anything else in

2    the Agreements.  Accepting Plaintiff's theory does not clarify

3    anything in the Agreements; it only permits Plaintiff to seek

4    payment for an acquisition, an event the Agreements cognize, but

5    for which they set up no payment structure like the one Plaintiff

6    requests.  In fact, Plaintiff's references to statements or

7    promises made during contractual negotiations contradict

8    Plaintiff's argument on this point.  The point of the parol

9    evidence rule is to avoid precisely this situation.  See <u>Seitz</u>, 141

10   U.S. at 517.

11       Therefore, the Court finds that Plaintiff's claims are barred

12   by the parol evidence rule.

13       **D.    <u>Misappropriation</u>**

14       Plaintiff contends that its claim succeeds based on its

15   conversion claims as to the proceeds of the Novartis transaction,

16   but the Court finds to the contrary.  Plaintiff's misappropriation

17   claim only restates its conversion claims, and it fails for the

18   same reasons.  It is DISMISSED WITH PREJUDICE, because the Court

19   finds that amendment would be futile.

20       **E.    <u>Unjust Enrichment</u>**

21       Plaintiff maintains that it has a claim for unjust enrichment

22   or quasi-contract, the elements of which are (1) a defendant's

23   receipt of a benefit and (2) unjust retention of that benefit at

24   the plaintiff's expense.  <u>Peterson v. Cellco P'ship</u>, 164 Cal. App.

25   4th 1583, 1593 (Cal. Ct. App. 2008).  Unjust enrichment is an

26   equitable claim that sounds in implied or quasi-contract.  <u>See</u>

27   <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1167

28   (9th Cir. 1996).  "The doctrine applies where plaintiffs, having no

enforceable contract, nonetheless have conferred a benefit on
defendant which defendant has knowingly accepted under
circumstances that make it inequitable for the defendant to retain
the benefit without paying for its value." Hernandez v. Lopez, 180
Cal. App. 4th 932, 938 (Cal. Ct. App. 2009).

In its September 26 Order, the Court rejected some of the
Defendants' arguments that the unjust enrichment claim had to be
dismissed because, among other things, Plaintiff failed to explain
the "benefit" to which it was entitled, and Plaintiff's claim was
governed by the express terms of the Agreements. Sept. 26 Order at
17-18. The first argument misstated the pleadings, and the second
was inapposite, because parties to a contract have no unjust
enrichment claims if the contract expressly defines their rights.
Cal Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94
Cal. App. 4th 151, 172 (Cal. Ct. App. 2001). Finally, the Court
held that, with Plaintiff being given leave to amend its conversion
and misappropriation claims, the unjust enrichment claim could be
pled in the alternative without Plaintiff's having to say so
explicitly. In short, the Court held that unjust enrichment would
potentially remain available. However, as explained below, new
legal arguments and clearer pleadings not at issue in the September
26 Order establish that equity does not permit or require the
availability of an unjust enrichment claim here.

First, Defendants challenge Plaintiff's citation to cases
finding unjust enrichment where funds specifically designated for
the plaintiff were taken or diverted by an agent who was to make
the payment to the plaintiff. See, e.g., Lectrodryer v. Seoulbank,
77 Cal. App. 4th 723, 725 (Cal. Ct. App. 2000); Cnty. of Solano v.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Vallejo Redevelopment Agency, 75 Cal. App. 4th 1262, 1277-78 (Cal.

2   Ct. App. 1999).  Defendants are correct that those facts are not

3   analogous to this case, as discussed in the above section on

4   conversion of proceeds owed.  Plaintiff has not indicated that the

5   funds paid to Defendants as consideration for their shares in

6   Corthera were specifically designated for Plaintiff.

7       Second, Plaintiff's other cases are inapposite not just

8   because, as Defendant Wiggans contends, they involve extra-

9   contractual harm and do not require contract interpretation, but

10  because they depend on the ruling courts' balancing of equities in

11  determining whether plaintiffs had stated claims for unjust

12  enrichment.  See, e.g., McKesson HBOC, Inc. v. N.Y. State Common

13  Ret. Fund, Inc., 339 F.3d 1087, 1093 (9th Cir. 2003) (interpreting

14  Delaware law, finding that unjust enrichment claims against

15  defendants who were not parties to a contract were not necessarily

16  precluded in an action based on securities fraud, but holding that

17  the availability of a legal remedy did not warrant piercing the

18  corporate veil to hold shareholders liable in equity, even if they

19  had been unjustly enriched); Kossian v. Am. Nat'l Ins. Co., 254

20  Cal. App. 2d 647, 649-51 (Cal. Ct. App. 1967) (holding that a

21  plaintiff who had repaired damaged property could recover under a

22  contract made between plaintiff and a non-party, because the

23  defendant insurance company had already been indemnified for the

24  repair and was not entitled to be repaid twice, in money and in

25  labor).

26      These cases do not state maxims about when plaintiffs can

27  recover under an unjust enrichment theory.  They undertake careful

28  analyses of the equities at work under those cases' facts, which is

**United States District Court**
For the Northern District of California

1  what application of unjust enrichment requires.  In this case, the
2  Court does not find that equity counsels allowing an unjust
3  enrichment claim to go forward.  The Court finds that, based on
4  Plaintiff's explanation of its conversion claims and the Court's
5  dismissal of those claims above, Plaintiff is ultimately asking for
6  something inequitable: that the Court should hold Defendants, all
7  corporate shareholders or employees of Plaintiff's contracting
8  party at one time or another, liable essentially because Plaintiff
9  believes it was entitled to payments under the Agreements.  The
10 Court sees no comparison here to the cases Plaintiff cites, in
11 which courts stated that unjust enrichment was available not just
12 because the plaintiffs had been wronged by defendants not parties
13 to related contracts, but because independent factors demanded the
14 application of an equitable remedy.

15      Moreover, the availability of legal remedies against other
16 parties -- Corthera or Novartis -- counsels against the Court's
17 application of an equitable remedy against defendants who are, in
18 most cases, protected by the corporate form.  See McKesson HBOC,
19 339 F.3d at 1094-95.  And based on Plaintiff's explanation of its
20 claims, it is clear that the parties' rights to payment were the
21 subject of the Agreements, and those integrated contracts exclude
22 Plaintiff's theory (despite the fact that they claim their suit is
23 not based on the contracts).  See Paracor Finance, 96 F.3d at 1167.
24 This claim was ironically well served by the original complaint's
25 vague pleading, since the clarified claims and briefing show that
26 there is no basis for equitable relief here.

27      The Court DISMISSES Plaintiff's unjust enrichment claim WITH
28 PREJUDICE, since the Court finds that amendment would be futile.

United States District Court
For the Northern District of California

1    V.    **CONCLUSION**

2         For the reasons described above, the Court GRANTS both motions

3    to dismiss Plaintiff Florey Institute of Neuroscience and Mental

4    Health's complaint.   Plaintiff's claims are DISMISSED WITH

5    PREJUDICE.

6

7         IT IS SO ORDERED.

8

9         Dated: March 26, 2014

10                                    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28